Grace DEGUIO, Conservator of the Estate of Dwight Deguio, and Grace Deguio, Individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 87-3091-C.

United States District Court, D. Massachusetts.

March 22, 1990.

Annette M. Gonthier, Costello, Frattaroli, Barrett, Gonthier & Goddard, P.C., Salem, Mass., for plaintiffs.

Paul Levenson, and Peter E. Gelhaar, Asst. U.S. Attys., Boston, Mass., for defendant.

CAFFREY, Senior District Judge.

This is an action under the Federal Tort Claims Act brought by the plaintiffs, Grace Deguio as conservator of the estate of Dwight Deguio and Grace Deguio individually, against the defendant, the United States of America, for money damages for personal injury allegedly caused by the negligent act or omission of an employee of the government while acting in the scope of his office or employment. 28 U.S.C. §§ 1346(b), 2674. Being an action against the United States under section 1346, the action was tried by the Court without a jury. 28 U.S.C. § 2402. Prior to trial, this Court granted the United States' motion for bifurcation of the trial on the issues of liability and damages, and thus only the issue of liability was tried by the Court.

## I. FINDINGS OF FACT

1. The plaintiff Grace Deguio is the mother and the conservator of the estate of Dwight Deguio who was rendered quadriplegic as a result of injuries sustained in an automobile accident. Dwight Deguio resides at 25 Congress Street, Amesbury, Essex County, Massachusetts.

2. The plaintiff Grace Deguio resides at 25 Congress Street, Amesbury, Essex County, Massachusetts.

3. The defendant, the United States of America, was the owner of an automobile operated on July 15, 1985 by its agent, servant and employee, Michael A. Rose, a captain in the United States Navy.

4. At approximately 6:00 a.m. on July 15, 1985, a series of automobile collisions occurred in the southbound roadway of Route 1 in Lynnfield, Massachusetts.

5. Route 1 south travels under an overpass where Route 129 crosses over Route 1. The automobile collisions which occurred on July 15, 1985 occurred in the vicinity of this underpass.

6. At the location of this underpass, Route 1 is a divided four lane highway. The southbound roadway of Route 1 consists of a passing lane, a travel lane, and a breakdown lane. The passing lane is bounded on the left by a solid yellow line, a curb, and a metal guard rail which separates the southbound passing lane from the oncoming northbound traffic and on the right by a broken white line which separates the passing lane from the travel lane. The travel lane is bounded on the left by the broken white line and on the right by a solid white line which separates the travel lane from the breakdown lane. The breakdown lane is bounded on the left by the

solid white line and on the right by a stone curb, a narrow sidewalk, and a vertical concrete wall.

7. Route 1 south inclines downward into the overpass and inclines upward after the overpass.

8. Route 1 south curves to the right under the overpass.

9. In the early morning hours of July 15, 1985, approximately .47 inches of rain fell in the area.

10. On the morning of the accident the road was wet and it was still raining or misty at 6:00 a.m., the time of the accident.

11. Underneath the overpass in the area of lowest elevation, a puddle of water had accumulated.

12. The puddle extended from the right curb, through the breakdown lane and the travel lane and ended at the broken white line dividing the travel lane from the passing lane. The puddle was ten feet in length from north to south.

13. The puddle was relatively deep, approximately 5 to 6 inches at the deepest point near the curb where the water naturally accumulated.

14. At approximately 6:00 a.m. on the morning of July 15, 1987, Captain Michael A. Rose, United States Navy, was travelling southbound on Route 1 on his way to the Navy Recruiting District located in Boston, Massachusetts where he was stationed at the time.

15. At this time, the traffic on Route 1 south was moderate commuter traffic.

16. Captain Rose had travelled Route 1 south to work daily for two years.

17. Captain Rose was driving a light grey 1984 Chevrolet Citation automobile owned by the United States Government.

18. Captain Rose was wearing a seatbelt and driving with the headlights on, as always required of all operators of government vehicles.

19. Captain Rose was travelling in the passing lane of Route 1 south as he approached the underpass where Route 1 travels under Route 129.

20. He was travelling in the passing lane to avoid the hazard created by the entry and exit of vehicles into and out of the travelling lane.

21. Captain Rose was travelling at a speed of approximately 45–50 m.p.h.

22. The posted speed limit was 50 m.p.h.

23. As Captain Rose approached the underpass, he noticed that the cars in front of him were braking suddenly, as evidenced by their brake lights and the dipping of the noses of the cars.

24. To avoid a potential accident, Captain Rose chose to move into the travel lane rather than hitting his brakes and coming to a near stop in the passing lane.

25. Approximately 100 feet from the underpass, Captain Rose changed lanes. After checking that the road was clear to his right, he moved from the passing lane into the travel lane.

26. Captain Rose experienced no difficulty in changing lanes.

27. After Captain Rose changed lanes and just before he entered the underpass, he saw before him the puddle which was located beneath the overpass.

28. Captain Rose did not recall applying the brakes before entering the puddle, but definitely did not apply the brakes while transversing the puddle.

29. Captain Rose entered the puddle.

30. When the right wheels of Captain Rose's vehicle made contact with the puddle, the car veered to the right toward the concrete wall.

31. Captain Rose attempted to take corrective action by steering to the left. Steering to the left had no effect while the car was in the puddle.

32. When Captain Rose's car emerged from the puddle and the wheels made contact with the pavement, Captain Rose's steering to the left, an overcorrection, caused the car to then spin counterclockwise.

33. Captain Rose's car spun 180 degrees and ended up in the passing lane facing the wrong direction.

34. During or after the spin, Rose's car stalled and then rolled up the incline in reverse until it came to rest approximately halfway up the incline.

35. While facing in the wrong direction in the passing lane, Captain Rose did not see any cars come to a stop facing him.

36. At some point after spinning around, the passenger's side of Captain Rose's car hit the guardrail which divides the southbound passing lane from the northbound lanes of Route 1, resulting in damage to the plastic coverings of the front and rear parking lights and denting the front and rear fenders just above the parking lights.

37. After the car came to a stop, Captain Rose started the car and began backing up the incline in the reverse direction in the passing lane.

38. Captain Rose chose to drive up the incline in reverse rather than turning around and driving forward up the incline because correcting the direction of the car would have forced him to block the entire southbound roadway and all the oncoming traffic.

39. Captain Rose drove in reverse to the top of the incline where a service road on the right intersects Route 1 south.

40. At this point, Captain Rose turned his car around and drove off Route 1 onto the service road.

41. Captain Rose parked along the right curb of the service road.

42. After Captain Rose's car had spun around and come to a stop in the passing lane facing the wrong direction, several collisions occurred.

43. At approximately 6:00 a.m. on July 15, 1985, Daniel Cajka was travelling on Route 1 south in the passing lane at a speed of approximately 40–50 m.p.h.

44. As Mr. Cajka approached the underpass where Route 1 travels beneath Route 129, he observed cars braking in front of him in the passing lane and he proceeded to do the same.

45. The cars in front of Mr. Cajka changed from the passing lane to the travel lane.

46. At this time, Mr. Cajka did not know why these cars were braking or changing lanes.

47. When Mr. Cajka came through the underpass, he saw a car, described as a light colored sedan, with its headlights on facing him in the passing lane. Mr. Cajka saw an elderly gentleman dressed in a military uniform in the driver's seat of this car.

48. The car that Mr. Cajka came upon which was facing in the wrong direction in the passing lane was the car driven by Captain Rose.

49. Mr. Cajka brought his car to a complete stop nose to nose with Captain Rose's car which was facing the wrong direction.

50. Mr. Cajka's car was then hit in the rear by a large sedan driven by Mr. Cerulli.

51. After being struck by the Cerulli vehicle, Mr. Cajka drove his car into the travel lane and up the incline and off of Route 1.

52. Mr. Cajka was able to move his vehicle forward because Captain Rose had begun to back his vehicle up the passing lane.

53. Thus, while Mr. Cajka was driving up the incline in the travel lane, Captain Rose was backing up the incline in the passing lane.

54. The car driven by Mr. Cerulli followed Mr. Cajka's car up and off of Route 1, and both cars parked in the driveway of a Flower Shop where the drivers then examined the damage to their vehicles.

55. Immediately thereafter, as Mr. Cajka was driving off the roadway, a peach colored Pinto automobile driven by Mr. Frank Chick and travelling in the passing lane of Route 1 south came through the underpass.

56. Mr. Chick saw in front of him in the passing lane a light grey car facing the wrong direction; again, this car was the vehicle driven by Captain Rose.

57. Upon seeing Captain Rose's car facing him in the passing lane, Mr. Chick

brought his car to a stop without colliding with Captain Rose's car.

58. A yellow pickup truck then came to a stop in the passing lane directly behind Mr. Chick's pinto.

59. Thereafter, a North American Van Lines truck driven by Mr. Kenneth Jones approached this scene in the travel lane.

60. Mr. Jones travelled under the overpass, through the puddle and proceeded up the incline.

61. Mr. Jones saw Captain Rose's vehicle facing the wrong direction in the passing lane, another vehicle to the right of Captain Rose's car, and Mr. Chick's Pinto directly behind Captain Rose's car.

62. As he came upon these vehicles, Mr. Jones slowed to 3–4 m.p.h. until the car in front of him in the travel lane began to move forward at which time Mr. Jones accelerated as quickly as possible.

63. Simultaneously, a brown Chevrolet Camaro automobile driven by Dwight Deguio and travelling in the passing lane of Route 1 south came through the underpass and up the incline.

64. On the morning of July 15, 1985, Mr. Deguio was travelling Route 1 south on his way to work at Lomas, Inc. in Saugus, Massachusetts, where he worked as a florist.

65. As Dwight Deguio's Camaro came through the underpass and up the incline, Mr. Deguio appeared to be decelerating and in complete control of the car.

66. As Mr. Deguio's Camaro began to change into the travel lane and come up behind the Jones' truck, a white and green DeCosta Egg truck came speeding around the corner.

67. The DeCosta Egg truck smashed into the rear of the Camaro.

68. As a result, Mr. Deguio's Camaro travelled up the incline at an angle.

69. The impact of the DeCosta truck sent the Camaro smashing into the yellow pickup truck which in turn collided with Mr. Chick's Pinto in front of it.

70. The impact of the DeCosta Egg truck also sent Mr. Deguio's Camaro smashing into the left rear mud flap bracket of the North American Van Lines truck driven by Mr. Jones.

71. The DeCosta Egg truck again rearended Mr. Deguio's Camaro and ended up resting on the right rear of the Camaro.

72. After Captain Rose had moved off of Route 1 and parked his car on the service road, he proceeded back to the accident scene.

73. At the accident scene, Captain Rose spoke to Mr. Chick. In response to Mr. Chick's inquiry as to which lane he had been driving in, Captain Rose stated that he had been in all the lanes.

74. Captain Rose asked Mr. Chick to exchange papers; Mr. Chick did not understand why he wanted to exchange papers because he said he had not been hit.

75. Captain Rose and Mr. Chick ultimately did not exchange papers.

76. At the accident scene Captain Rose also spoke with a Massachusetts state trooper, Officer Grant Moulaison, badge no. 835.

77. Captain Rose identified himself as a witness to the accident and told the officer that he had not hit anyone or been hit by anyone. The officer then directed Captain Rose to clear the area and he did.

78. When Captain Rose arrived at the Navy Recruiting District in Boston, he completed an accident report to reflect the damage to his vehicle.

## II. CONCLUSIONS OF LAW

Under the Federal Tort Claims Act ("FTCA"), the United States is liable, in the same manner and to the same extent as a private individual under like circumstances, for injury caused by the negligent or wrongful act or omission of any government employee committed while acting in the scope of his or her office or employment.[1] 28 U.S.C. §§ 1346(b), 2674. This

---

1. Under the FTCA, however, the United States shall not be liable for interest prior to judgment or for punitive damages. 28 U.S.C. § 2674.

Court has exclusive jurisdiction over this case under section 1346(b) which grants exclusive jurisdiction to the district courts over actions against the United States for money damages or personal injury caused by the negligence of any government employee committed while acting within the scope of his or her employment. 28 U.S.C. § 1346(b). The liability of the United States is determined by the law of the place where the act or omission of the federal employee occurred. *Id.* The acts of Captain Rose alleged by the plaintiffs to be negligent occurred in Massachusetts, and thus the law of Massachusetts governs this case.

The defendant, the United States, has stipulated that Captain Rose was driving a government vehicle on July 15, 1985 and was acting within the scope of his employment with the United States Government. Applying Massachusetts law, therefore, this Court need only decide whether Captain Rose acted negligently on July 15, 1985, and whether his negligence, if any, caused injury to the plaintiffs, Dwight Deguio and Grace Deguio.

■■■■ The plaintiffs have the burden of proving by a preponderance of the evidence both that the defendant was negligent and that the defendant's negligence was the proximate cause of the plaintiffs' injuries. *Alholm v. Town of Wareham*, 371 Mass. 621, 626, 358 N.E.2d 788 (1976). Massachusetts courts define negligence as a person's failure, either by omission or by action, to exercise that degree of care, vigilance, and forethought in discharging a duty imposed upon him or her which a person of ordinary caution and prudence ought to exercise under the same circumstances. *Altman v. Aronson*, 231 Mass. 588, 591, 121 N.E. 505 (1919); *Stepakoff v. Kantar*, 393 Mass. 836, 840, 473 N.E.2d 1131 (1985) (quoting *Altman*, 231 Mass. at 591, 121 N.E. 505); *Beaver v. Costin*, 352 Mass. 624, 626, 227 N.E.2d 344 (1967) (same). Under Massachusetts law, an operator of an automobile is under a duty to exercise reasonable care in the operation of his or her vehicle. *Fraser v. Flanders*, 248 Mass. 62, 66, 142 N.E. 836 (1924). Captain Rose would be negli-

gent if he, either by act or omission, failed to exercise the degree of care that a reasonably prudent driver would have exercised under the same driving conditions and circumstances that Captain Rose faced on the morning of July 15, 1985.

■■■ The plaintiffs argue that Captain Rose violated several Massachusetts statutes and regulations and that such violations prove that Captain Rose was negligent. "A violation of a statute, ordinance or regulation ... is evidence of negligence on the part of a violator as to all consequences that the statute, ordinance or regulation was intended to prevent." *Follansbee v. Ohse*, 293 Mass. 48, 52, 199 N.E. 387 (1935) (quoting *Guinan v. Famous Players–Lasky Corp.*, 267 Mass. 501, 516, 167 N.E. 235 (1929)); *Perry v. Medeiros*, 369 Mass. 836, 841, 343 N.E.2d 859 (1976); *Kralik v. LeClair*, 315 Mass. 323, 326, 52 N.E.2d 562 (1943); *Leveillee v. Wright*, 300 Mass. 382, 387, 15 N.E.2d 247 (1938). Thus, if Captain Rose violated any statute or regulation enacted to assure the safety of roadways and to prevent automobile accidents, such a violation would constitute evidence of his negligence in this case.

The plaintiffs first contend that Captain Rose violated Mass.Gen.L. ch. 90, § 17 which provides:

No person operating a motor vehicle on any way shall run it at a rate of speed greater than is reasonable and proper, having regard to traffic and the use of the way and the safety of the public.... [and that] notwithstanding [the] establishment of a speed limit, every person operating a motor vehicle shall decrease the speed of the same when a special hazard exists with respect to pedestrians or other traffic, or by reason of weather or highway conditions.

Mass.Gen.L. ch. 90, § 17. The plaintiffs contend that in light of the traffic on Route 1 that morning, which was moderate commuter traffic, and the safety of the public, Captain Rose's speed of 45–50 m.p.h. was greater than was reasonable and proper, and thus in violation of Mass.Gen.L. ch. 90, § 17. The plaintiffs further argue that Captain Rose violated Mass.Gen.L. ch. 90,

§ 17 because he failed to decrease his speed from the posted speed limit when a special hazard existed by reason of the rainy weather conditions, the puddle and the moderate traffic.

■ Upon the evidence, this Court cannot conclude that Captain Rose violated Mass.Gen.L. ch. 90, § 17 by any of his actions or omissions while driving on Route 1 on the morning of July 15, 1985. First, this court concludes that Captain Rose's speed of 45–50 m.p.h. was reasonable and proper for moderate commuter traffic and light rain. Second, no evidence was offered to prove that a speed of 45–50 m.p.h. was unreasonable under those conditions. The only evidence even bearing on the issue of reasonable and proper speed were the testimonies of Mr. Cajka and Mr. Jones as to the speed at which they were travelling under the same traffic and weather conditions. Mr. Cajka testified that he was travelling at a speed of 40–50 m.p.h. that morning under the same traffic conditions as Captain Rose. Mr. Jones stated that he decreased his speed to 30–35 m.p.h.; thus, he was travelling at a speed greater than 35 m.p.h. in the same moderate traffic in which Captain Rose was driving. Accordingly, Captain Rose's speed of 45–50 m.p.h. was reasonable and proper and not in violation of Mass.Gen.L. ch. 90, § 17.

Further, this Court finds that neither the light rain nor the moderate traffic created such a special hazard as to require motorists to decrease their speed from the posted speed limit. As for the puddle, even if it is considered a special hazard, there is no direct evidence that Captain Rose failed to decrease his speed before entering it. Captain Rose does not remember whether he braked before entering the puddle or not, and no other person witnessed Captain Rose's vehicle as it approached and entered the puddle. Likewise, the circumstantial evidence, such as the effect that the puddle had on Captain Rose's vehicle, does not prove to this Court that Captain Rose failed to reduce his speed before entering the puddle. Moreover, even if Captain Rose did fail to decelerate, such a failure would not constitute a violation of Mass. Gen.L. ch. 90, § 17 because he had no warning of the puddle before he entered it. He did not have reason to know of the existence of the puddle and did not see the puddle until after he had switched into the passing lane and was approximately fifty feet from it. Accordingly, Captain Rose did not violate Mass.Gen.L. ch. 90, § 17, and the plaintiffs cannot use this statute as evidence of Captain Rose's negligence.

■ Second, the plaintiffs contend that Captain Rose violated Regulations 9.06(6)(a) and 9.06(7) of the Code of Massachusetts Regulations. Mass.Regs.Code tit. 720, §§ 9.06(6)(a), 9.06(7). Regulation 9.06(6)(a) provides: "No person shall drive in such a manner so as to obstruct unnecessarily the normal movement of traffic upon any highway." Mass.Regs.Code tit. 720, § 9.06(6)(a). Although Captain Rose's car did obstruct traffic, Captain Rose did not obstruct the traffic on Route 1 by his manner of driving, but rather because a puddle on the roadway caused him to lose control of his vehicle. Captain Rose did not intentionally drive in such a manner as to unnecessarily obstruct the traffic along Route 1. Thus, this Court concludes that Captain Rose did not violate this regulation.

■ Regulation 9.06(7), which the plaintiffs also claim Captain Rose violated, states: "The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard to the speed of such vehicle and the traffic upon and the condition of the highway." Mass.Regs.Code tit. 720, § 9.06(7). The plaintiffs allege that while Captain Rose was travelling in the passing lane of Route 1 as he approached the underpass, he was following the vehicle in front of him more closely than was reasonable and prudent, having regard to the speed of the traffic and the wet roadway of Route 1. The plaintiffs ask this Court to reach the conclusion that Captain Rose was travelling more closely than was reasonable and prudent based upon Captain Rose's testimony that when confronted with braking cars in front of him, he chose to switch into the travel lane rather than brake in the passing lane because it was the safest alternative.

The plaintiffs, however, ignore most of Captain Rose's testimony on this point. Captain Rose did not testify that he could not brake safely in the passing lane. He testified that it was possible that he could have applied his brakes without colliding with the car in front of him, but that he chose what he viewed to be a safer course of action—switching lanes. He viewed changing lanes as a safer alternative because slowing and eventually stopping on a fast moving road can create a hazard. He stated that "avoidance is the first, better choice of any other action you choose to take." From this testimony and in the absence of any other probative evidence, this Court cannot draw the inference that Captain Rose was following the vehicle in front of him more closely than was reasonable or that he was travelling at a speed that was unreasonable in light of the weather and traffic conditions. Accordingly, this Court does not find Captain Rose to have violated Regulation 9.06(7). Mass. Regs.Code tit. 720, § 9.06(7).

■ In addition to arguing that Captain Rose violated various statutes, the plaintiffs also urge this Court to infer negligence from the course of travel of Captain Rose's vehicle, his loss of control of the vehicle, and other attending circumstances. *See Interstate Busses Corp. v. McKenna,* 329 Mass. 1, 3–4, 105 N.E.2d 852 (1952) (evidence that an automobile came down a hill around a curve on a wet road at a speed of 45–50 m.p.h. coupled with evidence of skidding warranted a finding of negligence); *McKeague v. Henry Jenkins Transportation Co., Inc.,* 323 Mass. 404, 405–06, 82 N.E.2d 8 (1948) ("... skidding accompanied by other evidence of road and traffic conditions apparent to the operator of a motor vehicle and his conduct in relation to the same may indicate negligent operation of such vehicle."); *see also Morton v. Dobson,* 307 Mass. 394, 398, 30 N.E.2d 231 (1940). The plaintiffs argue that the effect the puddle had on Captain Rose's vehicle, the fact that he lost control of his vehicle, and the fact that Captain Rose's vehicle spun around after transversing the puddle prove that Captain Rose was travelling at a speed greater than the 50 m.p.h. speed limit at which he testified he was travelling. The plaintiffs argue, therefore, that Captain Rose was negligent in travelling at such a high speed (over 50 m.p.h.) on a wet road in rainy weather and in transversing a puddle at such speed.

Although this Court recognizes that negligence may be proven from the physical circumstances attending an automobile collision or loss of vehicle control, the evidence in this case does not prove that Captain Rose was speeding or that he was negligent in any other manner. The facts that Captain Rose's vehicle was pulled to the right when he was in the puddle and that he lost control and spun around after emerging from the puddle could reasonably have occurred while Captain Rose was travelling at a speed of 45–50 m.p.h. as he testified and do not prove by a preponderance of the evidence that he was driving at a speed greater than 50 m.p.h. Moreover, as stated above, the Court finds that travelling at 45–50 m.p.h. in light rain and moderate traffic does not constitute negligence. Accordingly, the course of travel of Captain Rose's vehicle, his loss of control and other attending circumstances do not prove that Captain Rose acted negligently in driving his car on the morning of July 15, 1985.

Upon consideration of all the evidence, this Court concludes for the following reasons that Captain Rose did not act negligently, but rather exercised reasonable care in the operation of his vehicle on Route 1 at approximately 6:00 a.m. on July 15, 1985. First, as previously discussed this Court finds that travelling on Route 1 in moderate traffic and light rain at a speed of 45–50 m.p.h. was reasonable. Second, Captain Rose's act of switching lanes, instead of braking and stopping, when confronted with braking cars in front of him was a reasonable and prudent decision in light of the fast moving, moderate traffic on Route 1 that morning.

■ Third, this Court does not conclude, as plaintiffs argue, that Captain Rose's failure to see the puddle until he was fifty feet from it was the result of his negligent inattention to the road. Rather, Captain Rose failed to see the puddle earlier because it was not in his line of vision until after he had switched lanes and was ap-

proximately 50 feet from the puddle. Captain Rose was not negligent, therefore, by his failure to see the puddle earlier.

█ Fourth, this Court concludes that by turning his wheel to the left to prevent his car from being drawn to the right while it was in the puddle, Captain Rose's action to correct the direction of his vehicle was reasonable and prudent. Although it is true that his car spun around as a result of an overcorrection, this Court does not believe that this overcorrection constituted a negligent failure to act as a reasonable and prudent person would have acted under the same emergency circumstances.

█ Last, this Court concludes that Captain Rose acted reasonably and prudently in backing his vehicle up the incline in reverse, rather than turning around. As Mr. Jones testified, if Captain Rose chose to correct the direction of his vehicle, he would have blocked all lanes of traffic and created a more dangerous situation. Moreover, after his vehicle spun around, Captain Rose did not remain stopped in the wrong direction an unreasonably long time or otherwise fail to get off the roadway as quickly as possible. Captain Rose testified that he restarted his vehicle as soon as he could, and his testimony is corroborated by the testimony of Mr. Cajka who stated that Captain Rose was backing out of the area as he and Mr. Cerulli were moving around Captain Rose's vehicle to travel off the roadway. Accordingly, this Court concludes that Captain Rose did not fail, either by act or omission, to exercise the same degree of reasonable care that a person of ordinary caution and prudence would have exercised under the same driving conditions and circumstances that Captain Rose confronted on Route 1 at 6:00 a.m. on July 15, 1985. Thus concluding that Captain Rose was not negligent, this Court does not reach the issue of proximate causation.

For the foregoing reasons, judgment should be entered for the defendant, the United States of America.

Order accordingly.